# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

  v.                                                              Case No. 11-CR-3

**EDGAR LUGO-NUNEZ, a/k/a LUIS LOPEZ**
        Defendant.

## SENTENCING MEMORANDUM

Immigration and Customs Enforcement ("ICE") agents received information from an informant about a source for fraudulent identification documents in Milwaukee. An undercover agent subsequently made four purchases of fraudulent permanent resident and social security cards from defendant Edgar Lugo-Nunez, a/k/a Luis Lopez. Upon arresting defendant, agents learned that he had previously been deported following felony convictions for receiving stolen property and theft. Agents also executed a search warrant at a residence defendant shared with another person, seizing a computer and other evidence of the production of false documents. Forensic analysis of the computer revealed twenty-three images of fraudulent documents.

Defendant pleaded guilty to transferring fraudulent identification documents, contrary to 18 U.S.C. § 1028(a)(2), and unlawful re-entry after deportation, contrary to 8 U.S.C. § 1326(a) & (b)(2), and I ordered a pre-sentence report ("PSR") in anticipation of sentencing. In imposing sentence, the district court must first calculate the guideline range, then select an appropriate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010).

## I. GUIDELINES

On the fraudulent document count, defendant's PSR set base offense level of 11, U.S.S.G. § 2L2.1(a), then added 6 levels based on the number of documents involved (25-99), § 2L2.1(b)(2)(B), for an adjusted level of 17. On the re-entry count, the PSR set a base level of 8, U.S.S.G. § 2L1.2(a), then added 8 levels because defendant was deported subsequent to his conviction for an aggravated felony, § 2L1.2(b)(1)(C), for an adjusted level of 16. As the two offenses involved different criminal objectives, the PSR declined to group them, instead applying the multiple count adjustment under U.S.S.G. § 3D1.4, which produced a combined adjusted level of 19. Subtracting 3 levels for acceptance of acceptance of responsibility under § 3E1.1, the PSR recommended a final offense level of 16. Coupled with defendant's criminal history category of III, level 16 produced an imprisonment range of 27-33 months.

Defendant objected to the 6 level enhancement under § 2L2.1(b)(2)(B). As indicated above, the government conducted four buys of documents from defendant, and then seized a computer from the apartment he shared with another person, which contained twenty-three additional documents. Defendant did not dispute these facts but rather argued that the government failed to sufficiently tie him to the computer such that he should be held responsible for the additional documents.

The government bears the burden of proving the applicability of a guideline enhancement by a preponderance of the evidence. See United States v. Christ, 513 F.3d 762, 776 (7th Cir. 2008). In arguing that the government failed to meet its burden, defendant noted that two individuals shared the space where the computer was found, and the government produced no evidence suggesting that the computer belonged to him or that he was the person who used the computer to make the false identification documents. Defendant stated that he

2

acted as a "runner" of false identification documents but did not create them.

However, defendant's argument ignored the fact that guideline enhancements are based not just on the defendant's specific, individual conduct, but in the case of jointly undertaken criminal activity – whether or not charged as a conspiracy – all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. See U.S.S.G. § 1B1.3(a)(1)(B); see also Christ, 513 F.3d at 776. Here, assuming that everything defendant said was true, he admitted working with another person to sell these documents. Under his version, another person – presumably his roommate who used the computer – created the documents, and defendant delivered them. The undisputed facts in the PSR showed that defendant met with prospective customers (including the undercover agent), received photos and payments, and then delivered the documents after they were completed. Given this business arrangement, I found it reasonably foreseeable to defendant that the offense would involve more than just the four sets of documents he delivered in the controlled buys. I found that the other documents found on the computer were foreseeable and created in furtherance of the jointly undertaken document sale venture. Therefore, the enhancement applied.

As defendant noted, this finding had a limited impact on the final offense level. Without the 6-level enhancement on the document count, the offense level on the re-entry count was higher and thus controlled under U.S.S.G. § 3D1.4, producing a combined adjusted level of 17 and a final level of 14. Under that construction, the imprisonment range would have been 21-27 rather than 27-33 months. Defendant further noted that even including the documents found on the computer, he fell at the low end of the 25-99 range creating the 6 level increase; 6-24 documents creates just a 3 level increase. I considered this argument under § 3553(a). Finally, as defendant also noted, I possessed the discretion, under § 3553(a), to impose the

3

same sentence regardless of whether there were 4 documents or 27.

## II.  SECTION 3553(a)

**A.    Sentencing Factors**

Section 3553(a) provides that the court, in determining the particular sentence to be imposed, shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The statute directs the court, after considering these factors, to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id.

While the guidelines serve as the starting point and initial benchmark in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009).  Rather, the court must make an independent determination, without any thumb on the

4

scale favoring a guideline sentence, United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007), taking into account the types of sentences available, the relevant § 3553(a) factors, and the arguments of the parties, see Gall, 552 U.S. at 49-50.

**B.    Analysis**

**1.    The Offense**

On September 29, 2010, ICE agents learned from a confidential informant ("CI") that a certain phone number was a source in Milwaukee for the purchase of fraudulent documents. On November 9, 2010, agents had the CI call the number to determine if the documents were still available. The Spanish speaking male who answered the phone indicated that he could produce a fraudulent permanent resident card and social security card for $130. On November 15, an undercover agent called the number, asked to purchase documents, and arranged a meeting. At the meeting, the agent supplied a photo and a $30 down payment; the following day, the agent met with the same male, paid the remaining $100, and received the cards. Agents were able to identify the male through Wisconsin driver's license photos as defendant, "Luis Lopez." On three subsequent occasions, the undercover agent met with defendant and obtained documents, ostensibly for others, for $130.

Agents arrested defendant on a warrant on December 16, 2010, and the agent, who was part of the arrest team, identified him as the person he dealt with on each transaction. Agents later learned that defendant had unlawfully re-entered the United States some time in 2010. He had previously been convicted under the name Edgar Lugo-Nunez (his true name) of felony receiving stolen property and theft in Indiana, receiving a sentence of 545 days jail suspended for unsupervised probation, then turned over to ICE and deported at El Paso, Texas on

February 12, 2010.

Agents secured a search warrant for an address associated with the investigation, and in a basement apartment they seized a computer and other evidence of the production of false ID documents, including a printer, two scanners, a digital camera, card stock, laminate, a paper cutter, and shredded fraudulent social security cards. Two photographs of defendant were found hanging on the wall in a room in the apartment. Subsequent forensic analysis of the computer revealed twenty-three images of fraudulent documents and six blank images of social security cards.

In his statement to probation, defendant accepted responsibility for the four sales of documents. However, as discussed above, he indicated that he shared the apartment's basement with another man and asserted that he did not use the computer in the basement to create false documents; he stated that the computer was used only by the other person who shared the basement apartment. Defendant indicated that he acted as a runner for the sale of documents, meaning that he met with individuals buying the documents to collect the money and information, and then provided the documents to the buyer. He also accepted responsibility for re-entering the country illegally about five months after being removed. He stated that he came back to see his son, a U.S. citizen. He indicated that he planned to create a life in Mexico once returned.

**2. The Defendant**

Defendant was young, just twenty-one, with a limited prior record – the 2010 Indiana receiving stolen property and theft cases mentioned above, which he committed at age seventeen and which precipitated his deportation; and a 2009 driving without a license case, for which he was sentenced to 38 days in jail.

Defendant was born in Mexico in 1989 and came to the United States at age thirteen to live with his father in Indiana. He admitted that while living in Indiana he became affiliated with a gang at age fifteen, but he no longer considered himself an active member. Defendant's father still lived in Indiana, but his mother and sister remained in Mexico. His father stated that he brought defendant to this country to study and have a better education. Unfortunately, defendant got involved with gangs and drugs, and dropped out of school. Defendant reported a work history, but some of it could not be confirmed, as he apparently either worked for cash or with a false social security number. From 2007 to 2010, he reported earning a rather remarkable $3000 to $4000 cash every two weeks for painting and construction companies in Indiana, working from 7:00 a.m. to 2:00 a.m. Probation did confirm employment as a part-time laborer from 2006 to 2008.

Defendant had a son, age two, who lived with his mother in Lafayette, Indiana. As indicated above, defendant stated that he came back to the United States to be with his son and girlfriend, but found that she was in another relationship. Prior to his arrest in this case, defendant was living with friends in Milwaukee. He admitted past use of marijuana and cocaine.

Defendant did appear to have plans for the future – learning English and working in the tourism industry in Cancun. He stated that he was anxious to return to Mexico to assist in the care of his disabled mother.

### 3. The Sentence

The guidelines called for a term of 27-33 months, and I agreed that a period of imprisonment was necessary, primarily to promote respect for immigration law and to deter others from engaging in similar conduct. The sentence also had to be sufficient to deter

defendant from again returning unlawfully. The government argued for a sentence at or near the guidelines, while defendant requested a year and a day.

I agreed with defendant that given the nature of his record, which included no history of violence, and the fact of deportation after he finished any sentence, that the need to protect the public was not great. I also agreed with defendant that it appeared his role in the document operation was essentially that of a middle-man, and he did not profit significantly. And as discussed above, even including the documents found on the computer, this was not a very large operation, barely qualifying for the 6 level guideline increase.

On the re-entry count, I found it appropriate to consider defendant's motive for returning and the nature of his conduct once he came back. Someone who returns to be with and support his family is generally more deserving of leniency than one who returns to commit crimes. See United States v. Arguijo–Cervantes, 551 F. Supp. 2d 762, 765 (E.D. Wis. 2008). Here, I saw a mixed picture: defendant stated that he paid coyotes to help him return so he could be with his girlfriend and son in Indiana, but found that she had moved on with another man. It was unclear to me why this meant he could not have a relationship with his son, even if the relationship with the mother was over. In any event, he then traveled to Milwaukee and got involved in the fraudulent document business. He stated that he got into this to make money to pay off the debt he incurred attempting to return. I was also not sure what to make of that explanation; given his reported work history, it appeared that he could have made more working legitimate jobs. He admitted that he profited little from the document sales.

Defendant made some additional arguments for leniency, which I found worthy of some consideration. Defendant resolved this case fairly promptly and with minimal expenditure of resources, and he accepted responsibility for his conduct. While he did not formally request

"fast-track" credit, the manner in which he handled this case was basically consistent with fast-track policy. See United States v. Reyes–Hernandez, 624 F.3d 405, 422 (7th Cir. 2010).

Regarding specific deterrence, defendant noted that the longest prison term he had previously served was 38 days, and I agreed that it is appropriate for the court, when considering the type of sentence necessary to deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). Here, even a time-served sentence amounted to 6 months, and the year and a day term defendant advocated represented a significant increase over past sentences. Further, the family ties defendant had in Mexico provided at least some reason to think he would not come back, unlike some for whom re-entry seems almost inevitable.

Defendant also argued that the underlying felony giving rise to the 8-level enhancement for the illegal re-entry count – receiving stolen property – was less serious than some other aggravated felonies. He noted that he received a primarily stayed sentence in that case. I agreed that this was a factor I could consider, although the cases on this issue, including the cases defendant cited, typically involve the more severe 16-level enhancement. See United States v. Chavez-Suarez, 597 F.3d 1137 (10th Cir.), cert. denied, 131 S. Ct 286 (2010); United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 964 (E.D. Wis. 2005). Nevertheless, I gave this argument some weight. Defendant was just seventeen when he committed that offense and the sentence was mostly suspended, which reflected the state court's impression of its

9

severity.[1]

Defendant also argued that, because of his deportable status, he would be denied certain programming, would not receive pre-release halfway house time, and would spend additional time in custody awaiting removal, consequences not experienced by non-deportable offenders. This is an argument I have heard before, and it is one I can consider, although defendant provided no evidence or data as to how long he would likely remain in immigration custody after completion of his sentence awaiting deportation. It was also unclear whether, absent his deportable status, he would receive halfway house time and, if so, how much. I therefore found that this argument deserved limited weight here. Defendant noted that he would face deportation regardless of the sentence imposed, which meant he could not return to the United States to see his son. This is a collateral consequence I can consider, see United States v. Ferreria, 239 F. Supp. 2d 849 (E.D. Wis. 2002), but as indicated, it did not appear that he was really doing much with his son even before his arrest in this case.

Therefore, while I found a somewhat below range sentence sufficient, I could not conclude that the year and a day term defendant requested was appropriate. Under all the circumstances, I found a sentence of 18 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence accounted for the mitigating factors discussed, while providing a sufficient measure of punishment and deterrence.

### III.  CONCLUSION

Therefore, for the reasons stated herein and on the record, I committed defendant to

---

[1] As I also discussed in Galvez-Barrios, there is an element of double-counting in § 2L1.2, as the guideline bases the offense level largely on the defendant's criminal history, which is also accounted for on the horizontal axis of the grid. 355 F. Supp. 2d at 961.

the custody of the Bureau of Prisons for 18 months on each count concurrent. This sentence was based on § 3553(a) and would have been the same even if I had agreed with defendant on the guideline issue. I noted that this sentence was below the range had I adopted defendant's guideline argument. See United States v. Sanner, 565 F.3d 400, 406 (7th Cir. 2009). Based on his financial situation, I determined that defendant lacked the ability to pay a fine and so waived the fine. Because he faced certain removal, and thus would not be available for supervision, and because it was not required by the statutes of conviction, I imposed no supervised release. Other terms and conditions of the sentence are found in the judgment.

Dated at Milwaukee, Wisconsin, this 10th day of June, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge